UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


<u>United States of America</u>


      v.                         Criminal No. 10-cr-84-JD
                                        Opinion No. 2011 DNH 057

<u>Branden Anderson</u>


<u>O R D E R</u>

Branden Anderson has been indicted on charges of conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. He moves to suppress evidence that was found and statements that he made after he was stopped for a traffic violation on March 5, 2008. The government opposes the motion.[1]


<u>Background</u>

On the night of March 5, 2008, Branden Anderson was stopped by Oklahoma Highway Parol Trooper Branson Perry on Route I-40 in Canadian County, Oklahoma. After giving Anderson a warning for a traffic violation, Trooper Perry continued to question Anderson, which led to a search of Anderson's pickup truck and Anderson's arrest. Among other things, a large amount of cash and several

_____

[1]Anderson's motion to strike the government's objection for failure to comply with Local Rule 7.1(a)(2) was previously denied.

cell phones were found in Anderson's truck.  Anderson was taken
to the Oklahoma Highway Patrol Special Operations Headquarters in
Oklahoma City where he was questioned by DEA Special Agent Colby
Cason.

On June 16, 2010, Anderson was indicted on one count of
conspiracy with intent to distribute in excess of five kilograms
of cocaine.  He was arraigned on October 15, 2010.  Anderson
moved to suppress the evidence found in the truck and the
statements he made to Special Agent Cason.  A hearing was held on
the motion on February 17, 2011.

The night before the hearing, Anderson filed a supplemental
motion to suppress.  Trooper Perry and Special Agent Cason
testified at the hearing.  Anderson did not testify.  The
government showed the audio-video tape of the traffic stop and
subsequent events taken from Perry's patrol car.  Anderson and
the government filed post-hearing memoranda in support of their
respective positions.

<u>Facts</u>

The following facts have been proven beyond a preponderance
of the evidence.

On the night of March 5, 2008, Branden Anderson was driving
a four-door pickup truck heading west on I-40 in Oklahoma with a

2

passenger, Amber Schoenwald.  Trooper Branson Perry, of the
Oklahoma Highway Patrol, was working a special assignment on I-40
and was in his patrol car parked on the center median.  Perry saw
another trooper stopped with his emergency lights on, further
west on I-40, and saw Anderson's truck fail to move to the left
lane when he passed the other trooper's car, in violation of
Oklahoma law.

Perry activated his emergency lights, pulled out onto the
highway, caught up with Anderson's truck, which was then in the
left lane, and pulled him over.  As soon as Perry activated his
emergency lights, the audio-video camera mounted in the patrol
car began filming the scene in front of the car and recording
sound.  Perry approached the passenger side of the truck.  The
passenger, Schoenwald, rolled the window down only about six
inches.  Perry noticed that there was a lot of luggage stacked in
the back seat of the truck.  Perry told Anderson why he had
stopped him and told him to bring his driver's license back to
Perry's patrol car.

Anderson got out of the truck and met Perry as they both
walked toward Perry's patrol car.  Perry told Anderson to sit in
the front passenger seat of the patrol car.  Perry's trained dog,
Kilo, was in the back.  Perry noticed that Anderson was becoming
more and more nervous.  Perry also noticed that Anderson had

3

trouble explaining the nature and purpose of his trip from New
Hampshire to California.  Perry continued to converse with
Anderson.  Perry saw that Anderson was relaxed when talking about
Schoenwald and their wedding plans but that his stress level
increased when Perry asked about insurance and registration for
the truck.  When Perry went back to the truck to get the
insurance and registration papers, Schoenwald already had them in
her hand and gave them to Perry.  Perry thought Schoenwald also
seemed unusually nervous.

After checking with Oklahoma dispatch for information on
Anderson, Schoenwald, and the truck and finding no problem, Perry
said that he would only issue Anderson a warning for the traffic
violation.  Perry had Anderson sign the warning and then gave
Anderson all of his documents back and shook his hand.  Perry
noticed that Anderson's hand was sweating.  As Anderson opened
the car door and stepped out, Perry called "Branden?" and asked
if he had a few more minutes for some additional questions.
Anderson replied, "Ya," and got back into the patrol car.

During the additional questioning, Perry asked Anderson
whether there were illegal drugs, firearms, or alcohol in the
truck, and Anderson answered no.  Anderson admitted that he and
Schoenwald smoked marijuana but denied that there was marijuana
in the truck at that time.  When Perry asked to search the truck

4

for illegal drugs, firearms, and alcohol, Anderson first agreed
and then did not consent to a search.  Perry had his dog, Kilo,
who was certified in drug detection, walk around the outside of
the truck, and Kilo alerted on the driver's and front passenger's
doors.

Perry told Anderson that based on the dog's alert, he was
going to search inside the truck.  Perry waited for additional
troopers and officers to arrive to assist with the search.
Schoenwald was moved to the patrol car and sat with Anderson.
Their conversation was recorded.

When Perry opened the driver's door of the truck, he noticed
that the door was heavier than normal.  Perry went back to the
patrol car to get his upholstery tool.  Trooper Hyde, who was
assisting in the search activity, told Perry that Anderson had
said that there was marijuana on the back seat of the truck.
Perry opened the driver's door panel and found bundles of
currency hidden inside the door.  Searches of the other doors
revealed more currency, forty-three bundles in total.  The
officers also found marijuana hidden in a plastic bottle with a
false bottom.

Anderson was handcuffed.  Perry told Anderson that he was in
a lot of trouble and asked him if he wanted to talk about what
was in the truck.  Anderson said, "No, sir."  A few minutes later

Anderson again declined Perry's invitation to talk about the
money found in the truck.  Perry took Anderson and Schoenwald to
Oklahoma Highway Patrol Special Operations Headquarters in
Oklahoma City.  During the drive, Perry talked with Anderson
about what was going to happen.  The truck was towed to
Headquarters for further processing.

At Headquarters, Anderson and Schoenwald were seated
together in the main office area.  DEA Special Agent Colby Cason
came into the area and asked to speak with Anderson.  Cason and
Anderson then went into an office.  Cason read Anderson the
<u>Miranda</u> rights from a card but did not obtain an express waiver
from Anderson.[2]  Cason told Anderson that cooperating could be in
Anderson's interest.  Anderson then told Cason about his
involvement in the conspiracy.  Anderson also told Cason that he
had two cell phones, one for personal use and one for business,
and he agreed to let Cason look at the phones.

<u>Discussion</u>

In support of his motion to suppress, Anderson challenges
the search of his truck under the Fourth Amendment, contends that
his statements to Special Agent Cason were obtained in violation

---

[2]<u>Miranda v. Arizona</u>, 384 U.S. 436, 478-79 (1966).

6

of his Fifth Amendment right to remain silent, and argues that
the investigation of the contents of the cell phones constituted
a warrantless search in violation of the Fourth Amendment.  The
government objects to the motion, asserting that the officers'
actions were within the constitutional limitations.

A.   Search of the Truck

     Anderson contends that Trooper Perry lacked probable cause
to stop him for a traffic violation, that his detention after
Perry issued the warning was unjustified and was not voluntary,
that Perry lacked a sufficient basis for conducting a "dog sniff"
of the truck, and that the dog's "alert" on the truck was
insufficient to support the search of the truck.  The government
argues that Anderson was legally stopped for a traffic violation,
that Anderson consented to answering Perry's questions after the
warning was issued, that Perry had reasonable suspicion of
criminal activity to support the "dog sniff" of the truck, and
that the dog's alert provided probable cause to search the truck.
The issues are addressed as follows.

     1.   Initial Stop

     Trooper Perry stopped Anderson for failing to move to the
left lane before he passed a patrol car on the side of the

7

highway with its emergency lights activated, as is required under Oklahoma law.  See 47 Okl. Stat. Ann. § 11-314(A)(1).  Anderson argues that because he was traveling in the left lane when Perry came upon him and was surprised when Perry told him he had failed to move over, it is likely that he was traveling in the left lane and did not violate the law.  Anderson contends that under the circumstances Perry lacked probable cause to stop him.

A traffic stop "must be supported by reasonable suspicion that a traffic violation has occurred."  United States v. Chaney, 584 F.3d 20, 24 (1st Cir. 2009).  "[R]easonable suspicion requires more than a mere hunch but less than probable cause."  United States v. Ruidiaz, 529 F.3d 25, 29 (1st Cir. 2008).  Reasonableness is judged based on the totality of the circumstances.  Id.

Perry's testimony about the circumstances preceding the stop was credible.  He recounted where he was when the events occurred, what he saw, and what he did in response.  Anderson's arguments that he may have moved to the left lane before passing the other patrol car, which rely on inferences from ambiguous circumstances, do not overcome Perry's testimony about what he saw.  Perry had reasonable suspicion that Anderson violated the traffic law, which supports stopping Anderson.

8

2.   <u>Questioning After the Traffic Violation Warning</u>

After Anderson signed the traffic violation warning, took
his license and other documents, shook Perry's hand, and got out
of the patrol car, Perry called to him and asked if he had a
minute to answer more questions.  Anderson responded, "Ya," and
got back into the patrol car.  Perry did not inform Anderson of
his rights under <u>Miranda</u> and began asking Anderson questions
about why he was nervous, whether he and Schoenwald smoked
marijuana, and whether drugs, alcohol, or firearms were in the
truck.  Anderson contends that Perry's questions after that point
constituted custodial interrogation in violation of the Fifth
Amendment.  The government responds that Anderson was not in
custody because he agreed to stay and answer questions and
remained free to leave.

Statements obtained from a suspect during custodial
interrogation are inadmissible against him absent "procedural
safeguards effective to secure the privilege against self-
incrimination."  <u>Miranda</u>, 384 U.S. at 444.  "Determinations about
<u>Miranda</u> custody begin by examining all of the 'circumstances
surrounding the interrogation' and asking whether 'a reasonable
person [would] have felt he or she was not at liberty to
terminate the interrogation and leave.'"  <u>United States v.</u>
<u>Ellison</u>, 632 F.3d 727, 729 (1st Cir. 2010) (quoting <u>Thompson v.</u>

9

Keohane, 516 U.S. 99, 112 (1995)).  Custody within the scope of
Miranda, means both that the suspect is not free to leave and
that he is subject to coercive pressure to answer the questions
asked.  Ellison, 632 F.3d at 729 (citing Maryland v. Shatzer, 130
S. Ct. 1213, 1224-25 (2010)).  In considering custody for
purposes of Miranda, the court considers "a range of factors
including (without limitation) where the questioning occurred,
the number of officers, the degree of physical restraint, and the
duration and character of the interrogation."  United States v.
Teemer, 394 F.3d 59, 66 (1st Cir. 2005).

In Teemer, the suspect was a passenger in a car stopped for
a traffic violation.  An officer asked Teemer and another
passenger to step out of the car so that he could talk with them.
Teemer and the other passenger complied.  Teemer did not have
identification with him but provided his name and birth date and
in response to the officer's question, admitted that he was on
probation in Georgia.  In the meantime, another officer found an
AK-47 assault rifle and ammunition in the back of the car.
Teemer, 394 F.3d at 61

At the officers' request, a supervisor arrived, who
questioned Teemer about his probation status and the gun found in
the car.  Teemer admitted that his fingerprints would be found on
the gun.  The supervisor called to check on Teemer's probation

10

status and upon learning that he had a felony conviction, the
supervisor ordered Teemer's arrest.  Id.

The district court denied Teemer's motion to suppress the
statements made after the car was stopped and before he was
formally arrested, concluding that Teemer had not been subject to
custodial interrogation.  Teemer was convicted following a jury
trial.  Id. at 62-63.  On appeal, Teemer argued that his
statements made at the scene of the stop and before his formal
arrest should have been suppressed because they were the result
of custodial interrogation without Miranda warnings.  Id. at 65.

In affirming the district court's decision, the First
Circuit determined that "both the circumstances and the officers'
testimony suggest that Teemer although not told to remain, would
not have been allowed to leave the scene once suspicion began to
envelop him."  Id. at 66.  The court also stated that "[w]e agree
with Teemer's claim that a reasonable person in his position
would not have thought himself free to walk away; and certainly
once the weapon was discovered, something more than a routine
traffic stop was in progress."  Id.  Despite those indicia of
custody, the court noted that Teemer "was not handcuffed, placed
in the police car, or subject to direct physical constraint . . .
and stood around in the vicinity of the officers, but not under
close guard or direct restraint."  Id.  The court concluded that

11

"on the broad spectrum from a speeding ticket to a grilling in
the squad room, the events here were in the Terry stop range and
short of any de facto arrest or custodial interrogation; given
this, and that the circumstances were not inherently coercive, no
Miranda warning was required."   Id.

In Ellison, the suspect was being held in jail when he
offered to provide information about robberies that were not the
subject of the then pending charges against him.  632 F.3d at
728.  Ellison was taken to the jail library to meet with a police
detective and another officer.  The detective asked that
Ellison's restraints be removed and told him that he was not
under arrest for the crimes they were going to discuss, that
Ellison did not have to answer questions, and that he was free to
leave at any time by summoning the guards.  Id.  Ellison agreed
to a recorded interview, told the detective and police officer
that his former girlfriend was the robber, and also implicated
himself in a supporting role in the robberies.  Id.  He was
indicted for his part in the robberies, and after the district
court denied his motion to suppress, pleaded guilty with a
condition to allow appeal of the denial of his motion to
suppress.  Id.

On appeal, the court noted the standard for determining
Miranda custody, and in particular noted the requirement for

coercive pressure in addition to a lack of freedom of movement. Id, at 729-30.  The court concluded that Ellison's circumstances of being questioned while a pretrial detainee, in response to his own offer to provide information, were not sufficiently coercive to implicate Miranda custodial interrogation.  Id. at 730.

In this case, Anderson was free to leave and was in the process of returning to his truck when Perry asked if he had time for more questions.  Perry did not order him to return to the patrol car or otherwise exert his authority or any degree of force to make Anderson comply with his request.  Anderson voluntarily sat back down in the patrol car next to Perry.

Perry, however, testified at the hearing that in his opinion Anderson was not free to leave when he called to him and that he would not have let Anderson leave if he had not returned on his own.  Miranda custody determinations are based on "'the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'"  Ellison, 632 F.3d at 729 (quoting Stansbury v. California, 511 U.S. 318, 323 (1994)).  Therefore, Perry's subjective view about whether Anderson was free to leave is not pertinent to the analysis.

As shown on the videotape, a reasonable person in Anderson's position would have believed, as he was getting out of the patrol

13

car, that he was free to leave.  Perry's question, asking him to
answer more questions, was not a command or made in a threatening
manner.  Perry remained seated in the car and did not display a
weapon or show any intention of following Anderson if he had
refused to return to answer more questions.  With his truck
nearby and all of his documents in hand, Anderson had the means
and the opportunity to leave.  Therefore, a reasonable person in
Anderson's position would not have believed he was required to
return to the patrol car to answer Perry's questions.  Instead,
Anderson chose to return and answer questions.

     Once Anderson was seated in the car again, Perry asked him
questions in a non-threatening but inquisitive manner.  Anderson
was not handcuffed or otherwise put into restraints; the door was
unlocked; Perry was inside the car and no other officers were
present; and the questioning lasted only a few minutes before
Perry decided to do a "dog sniff" of the truck.  Under these
circumstances and consonant with the reasoning in Teemer, the
circumstances do not show that Anderson was in custody.

     In addition, even if the circumstances supported a finding
that Anderson was not free to leave, any detention was not
sufficiently coercive to constitute custodial interrogation for
purposes of Miranda.  Although Anderson chose to sit back down in
the patrol car, he was not ordered to do so and under the

14

circumstances he might have answered questions from outside the door.  As is noted above, Perry did not brandish a weapon or otherwise assert his authority to intimidate Anderson.  His manner was pleasant and calm.  A reasonable person in Anderson's position would not have felt coerced to answer Perry's questions.

Therefore, Perry's questioning after he issued the traffic violation warning was not custodial interrogation in violation of the requirements of <u>Miranda</u>.

### 3.  <u>"Dog Sniff" of the Truck</u>

Anderson challenges Perry's use of the dog, Kilo, to conduct a "dog sniff" around the outside of the truck on the grounds that Perry lacked a sufficient basis to continue to detain him while the "dog sniff" was undertaken.  Because the court has concluded that the initial stop for a traffic violation was lawful, Anderson's claim is that the extension of the stop to allow for the dog sniff of his truck was unreasonable.  Anderson does not challenge the dog sniff on the grounds that walking Kilo around the outside of the truck itself constituted a Fourth Amendment violation.  <u>See</u> <u>Illinois v. Caballes</u>, 543 U.S. 405, 409 (2005) ("[T]he use of a well-trained narcotics-detection dog--one that does not expose noncontraband items that otherwise would remain hidden from public view--during a lawful traffic stop, generally

15

does not implicate legitimate privacy interests." (internal quotation marks and citation omitted)); accord Muehler v. Mena, 544 U.S. 93, 101 (2005) ("[A] dog sniff performed during a routine traffic stop does not violate the Fourth Amendment.").

In Terry v. Ohio, 392 U.S. 1 (1968), and cases that followed, the Supreme Court held that the police can stop and briefly detain a person for investigation based on "reasonable suspicion supported by articulable facts that criminal activity may be afoot." United States v. Ramos, 629 F.3d 60, 65 (1st Cir. 2010) (internal quotation marks and citation omitted). If the initial detention was lawful, the court then considers whether an extension of the detention was reasonable. Id. The reasonableness of the extension is determined based on the totality of the circumstances taken in light of the officer's training and experience. Id. at 65-66. In that construct, the court does not consider whether the facts taken separately might have an innocent explanation and need not rule out possible innocent explanations. United States v. Wright, 582 F.3d 199, 205 (1st Cir. 2009).

In this case, Perry initially noticed that Anderson and Schoenwald had an unusual amount of luggage for their trip, that Anderson had trouble explaining the nature of their trip, and that both Anderson and Schoenwald seemed unusually nervous.

16

During the additional questioning, Anderson revealed that he and
Schoenwald smoked marijuana and Anderson continued to seem
unusually nervous.  Based on his training and experience, Perry
was aware that Route I-40 was a known drug transport route
through Oklahoma.

Perry's observations and Anderson's admission about
marijuana use provided reasonable grounds to extend the stop to
allow time for Kilo to sniff around the truck.  Although Anderson
attempts to undermine Perry's observations, innocent explanations
cannot overcome Perry's reasonable conclusion based on the
totality of the circumstances.

### 4.  Search Inside the Truck

When Kilo alerted at the driver's and front passenger's
doors, Perry decided to search inside the truck.  Anderson
contends that Perry lacked probable cause to conduct a
warrantless search inside of the truck because Kilo was not a
reliable drug dog.  In support, Anderson contends that Kilo
alerted on the interior console of the truck where no drugs were
found and notes that Perry admitted at the hearing that Kilo
would alert based on residual odors from drugs that were no
longer present.

17

Anderson concedes that a positive alert from a reliable drug dog constitutes probable cause to search a vehicle.  See United States v. Brown, 500 F.3d 48, 57 (1st Cir. 2007).  The evidence shows that Kilo was trained and certified in drug detection. Perry testified about Kilo's training and his competence. Anderson offers no authority to show that a dog with Kilo's credentials would not be considered reliable for purposes of establishing probable cause to search.  See, e.g., United States v. Owens, 167 F.3d 739, 749-50 (1st Cir. 1999) (despite dog's failure to pass certification tests and an opinion that he was not reliable, other indications of reliability adequately supported his ability to detect drugs).

The court finds that Kilo's alerts on the outside of the driver's and front passenger's doors constituted probable cause to search the truck.

5. Summary

Anderson was lawfully stopped for a traffic violation. Perry's additional questions after the traffic violation warning was signed did not constitute custodial interrogation in violation of the Miranda requirements.  The extension of the stop to use the dog to sniff around the truck was reasonable, and the search of the truck was properly supported by Kilo's alerts.

18

B.   Statements Made to Special Agent Cason

Anderson confessed his involvement in the drug conspiracy to
Special Agent Cason during questioning at the Oklahoma Highway
Patrol Headquarters.  Anderson contends that Perry violated his
rights at the scene of the stop when Perry told him that he was
in a lot of trouble and asked, without giving Miranda warnings,
if Anderson wanted to tell him about what was in the truck and
Anderson said "No Sir" and again when Perry asked Anderson if he
wanted to talk about the money, and Anderson again declined.[3]
Then, Anderson contends, Cason violated his rights by questioning
him despite his prior invocation of his right to remain silent
when questioned by Perry.  Anderson also challenges Cason's
questioning because he did not obtain an express waiver of
Anderson's rights.

1.   Invocation of the Right to Remain Silent

Anderson contends that by refusing to answer Perry's
questions about the money found in the truck, he invoked his

---

[3]Because Anderson did not provide statements in response to
Perry's questions, no inculpatory information was obtained in
violation of the Miranda protections.  Therefore, the court need
not and does not consider whether Perry's questioning complied
with Miranda requirements.  Instead, the exchange with Perry is
only pertinent to the question of whether Anderson invoked his
right to remain silent.

right to remain silent.  An accused has a right to remain silent
protected by the Fifth Amendment.  United States v. Rodriguez-
Velez, 597 F.3d 32, 44 (1st Cir. 2010).  To invoke the right to
remain silent and stop questioning by the police, however, the
accused must do so clearly and unambiguously.  Berghuis v.
Thompkins, 130 S. Ct. 2250, 2260 (U.S. 2010).  Mere silence in
response to questioning is insufficient to invoke the right.  Id.

     In this case, Anderson's response to Perry's questions about
what was found in the truck do not necessarily provide a clear
and unequivocal invocation of the right to remain silent.  For
example, it is not clear that a refusal to answer a question or
questions by one officer on a particular topic constitutes an
invocation of the right to remain silent generally.  See James v.
Marshall, 322 F.3d 103, 108 (1st Cir. 2003); United States v.
Sheltman, 2006 WL 3779793 at *2 (D. Mass. Dec. 21, 2006); cf.
United States v. Rambo, 365 F.3d 906, 910 (10th Cir. 2004)
(answering "no" when asked if he wanted to talk about the
"stuff," meaning robberies, was a clear invocation of the right
to remain silent).  Even if Anderson did invoke his right to
remain silent in response to Perry's questions, subsequent events
make his statements to Cason admissible.

2.   <u>Scrupulously Honoring Right to Remain Silent</u>

If Anderson clearly and unambiguously invoked his right to remain silent by refusing to answer Perry's questions, the next issue is whether his right was violated by Cason's questioning. Once an accused properly invokes his right to remain silent, his decision must be "'scrupulously honored.'"  <u>United States v. Lugo Guerrero</u>, 524 F.3d 5, 12 (1st Cir. 2008) (quoting <u>Michigan v. Mosley</u>, 423 U.S. 96, 103 (1975)).  To make that determination, the court considers four factors:

> (1) whether a significant amount of time lapsed between the suspect's invocation of the right to remain silent and further questioning; (2) whether the same officer conducts the interrogation where the suspect invokes the right and the subsequent interrogation; (3) whether the suspect is given a fresh set of <u>Miranda</u> warnings before the subsequent interrogation; and (4) whether the subsequent interrogation concerns the same crime as the interrogation previously cut off by the suspect.

<u>Lugo Guerrero</u>, 524 F.3d at 12.  In addition, a previous invocation of the right to remain silent may be waived if the suspect "'initiates further communication, exchanges, or conversations with the police.'"  <u>United States v. Thongsophaporn</u>, 503 F.3d 51, 55-56 (1st Cir. 2007) (quoting <u>Edwards v. Arizona</u>, 451 U.S. 477, 485 (1981)).

In this case, Anderson initiated conversation with Perry, asking Perry what would happen next.  Perry explained the procedures that would be followed at Headquarters, including an

21

interview by DEA.  The circumstances in this case do not suggest that Perry improperly coerced Anderson into that conversation. See Thongsophaporn, 503 F.3d at 56 (holding suspect initiated conversation with agent, after invoking right to remain silent, by asking agent "'what was going on'").  To the extent Anderson properly invoked the right to remain silent with respect to questions about the money found in the truck, his conversation with Perry eroded the scope of his right to remain silent.

Further, the factors for determining whether officers "scrupulously honored" the suspect's right to remain silent support a conclusion that Cason's subsequent questioning did not violate Anderson's right to remain silent.  The subsequent questioning occurred about two hours after Anderson declined to answer Perry's questions and was conducted by Cason, not Perry. Cason read Anderson his Miranda rights.  Although the questioning concerned the same criminal activity, Cason's questions were much broader than Perry's questions about the money that was found in the truck.

Under the circumstances, Cason's subsequent questioning of Anderson did not violate the requirement that officers scrupulously honor a suspect's invocation of the right to remain silent.  See, e.g., Grant v. Warden, Maine State Prison, 616 F.3d 72, 78 (1st Cir. 2010).

22

3.  <u>Waiver During Interview with Cason</u>

An accused's statements made during custodial interrogation are inadmissible against him unless the prosecution can show "that the accused 'in fact knowingly and voluntarily waived [<u>Miranda</u>] rights' when making the statement." <u>Berghuis</u>, 130 S. Ct. at 2260 (quoting <u>North Carolina v. Butler</u>, 441 U.S. 369, 373 (1979)).  When an express waiver is lacking, the court must presume that the accused did not waive his rights.  <u>United States v. Mejia</u>, 600 F.3d 12, 17 (1st Cir. 2010).  The government bears the burden of showing an implied waiver by a preponderance of the evidence.  <u>United States v. Rojas-Tapia</u>, 446 F.3d 1, 4 (1st Cir. 2006).

An implied waiver may be "'inferred from the actions and words of the person interrogated'" based on an examination of the "'totality of the circumstances surrounding the interrogation.'" <u>Id.</u> (quoting <u>Butler</u>, 441 U.S. at 373).  The court must determine "whether [the accused] made both an 'uncoerced choice' and had the 'requisite level of comprehension' such that a court may properly conclude 'that the <u>Miranda</u> rights have been waived.'" <u>Mejia</u>, 600 F.3d at 17 (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)).  The accused's choice must not be the result of intimidation, coercion, or deception, and the accused must have made the choice knowingly "with a full awareness of both the

nature of the right being abandoned and the consequences of the decision to abandon it." Berghuis, 130 S. Ct. at 2260.

The circumstances of Cason's interview with Anderson do not show intimidation, coercion, or deception.  Although Cason's interview of Anderson occurred in the very early morning hours after the traffic stop late in the evening before, nothing suggests that Anderson was particularly sleep deprived or that he had been denied sleep or food.  See Berghuis, 130 S. Ct. at 2263. Cason's manner was not threatening or intimidating, nor did he attempt to deceive Anderson into giving a confession.  Instead, by a preponderance of the evidence, the circumstances show that Anderson voluntarily decided to talk to Cason about the crime.

As the government points out, Anderson demonstrated a good understanding of the criminal process and of his rights during the process.  Anderson's prior conversation with Schoenwald, which was recorded in Perry's patrol car, shows that Anderson understood the situation and that he intended to cooperate with the police.  Therefore, his decision to waive his Miranda rights was also made with an understanding of the rights he waived and the consequences of doing so.

4.   Summary

Based on a preponderance of the evidence, Anderson did not
invoke his right to remain silent by refusing to answer Perry's
questions at the scene of the traffic stop.  Further, although
Cason apparently did not know that Anderson had refused to answer
Perry's questions, Cason's actions scrupulously honored
Anderson's right to remain silent, if it had been properly
invoked.

Anderson voluntarily and knowingly waived his Miranda rights
in giving his statement to Cason.


C.   Cell Phones

During the interview, Anderson talked to Cason about his
cell phones, which the police had retrieved from the truck.
Cason retrieved telephone numbers and other information without
first obtaining a search warrant.  Anderson contends that the
information taken from the cell phones must be suppressed because
it was obtained in a warrantless search.

"The Fourth Amendment protects '[t]he right of the people to
be secure . . . against unreasonable searches.'"  United States
v. Franklin, 630 F.3d 53, 59 (1st Cir. 2011) (quoting U.S. Const.
amend. IV).  The Fourth Amendment "'forbids the use of improperly
obtained evidence at trial.'"  Id. (Herring v. United States, 555

25

U.S. 135, 129 S. Ct. 695, 699 (2009)).  To avoid the Fourth

Amendment's prohibition, a search must be authorized by a warrant

based on probable cause or be conducted pursuant to consent.

<u>Franklin</u>, 630 F.3d at 59-60.

In this case, Cason obtained Anderson's consent to search

the cell phones.  During the interview, the cell phones were

outside of the room on a desk.  After Anderson explained the

nature of his activities, Cason asked him who he had called for

that activity and the relevant telephone numbers.  Anderson said

he had that information on the cell phones.  Cason asked Anderson

if he could look at the phones, and Anderson agreed.  Anderson

identified the cell phones and explained their use and contents.

Under these circumstances, Anderson agreed to allow Cason to

search the cell phones.

### Conclusion

For the foregoing reasons, the defendant's motion and

supplemental motion to suppress (documents nos. 11 and 19) are

denied.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
United States District Judge

April 6, 2011

cc:  Mark E. Howard, Esquire
     Debra M. Walsh, Esquire